IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CR. No. 23-1623-MLG |
| | ) | |
| **EDGAR GAYTAN-CARRILLO** | ) | |
| | ) | |
| Defendant. | ) | |

## OPPOSITION TO MOTION FOR RECONSIDERATION OF DETENTION ORDER

The United States hereby responds to Defendant Edgar Gaytan-Carrillo ("Gaytan")'s Motion for Reconsideration of Detention Order (Doc. 236) (the "Motion").  Gaytan's Motion understates his involvement in a major fentanyl trafficking conspiracy, his risk of flight, and his general danger to the community.  The facts here require continued detention.

### I.      LEGAL STANDARD

18 U.S.C. § 3142 governs detention and release issues.  Conditions of release must both "reasonably assure the appearance" of the defendant and "the safety of any other person and the community."  18 U.S.C. § 3142(g).  In determining whether conditions of release can be fashioned, the court must consider the following factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a minor victim, (2) the weight of the evidence against the defendant, (3) the defendant's history and characteristics, including ties to the community, employment, financial resources, criminal history, history of alcohol or substance abuse, and record concerning appearance at court proceedings, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g)(1) – (4).

1

Because this case involves an offense under the Controlled Substances Act, there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." *See* 18 U.S.C. § 3142(e)(3)(A). Defendant has the burden to rebut this presumption. If the Defendant satisfies this burden, the United States must show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community. *See United States v. Holguin*, 791 F. Supp. 2d 1082, 1087 (D.N.M. 2011) (collecting cases). The presumption, however, remains a factor in the Court's analysis. *See United States v. Villapudua-Quintero*, 308 F. App'x 272, 273 (10th Cir. 2009) ("Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain.").

## II.    GAYTAN HAS NOT OVERCOME THE PRESUMPTION FAVORING DETENTION.

Gaytan's burden to rebut the presumption is "not heavy, but some evidence must be produced." *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991) (reversing district court's grant of pretrial release due to failure to give effect to presumption favoring detention). Gaytan's evidence, at first glance, seems to meet the requirement.

A closer examination, however, undermines each piece of evidence. First, Gaytan claims that he "is a Mexican national who has been residing in Albuquerque since approximately 2006 when he legally entered on a B1 visa." Doc. 236 at 1. A B-1 visa, per the U.S. Citizenship and Immigration Services, allows applicants to stay for up to one year.[1] It requires that applicants: "plan to remain for a specific amount of time" and "have a residence outside the United States that

---

[1] *See* https://www.uscis.gov/working-in-the-united-states/temporary-visitors-for-business/b-1-temporary-business-visitor.

2

you have no intention of abandoning." *Id.* Assuming that we take Gaytan's attorney proffer at face value, it only confirms that he misrepresented his purpose in coming to the United States or had "no intention of abandoning" Mexico. Either way, Gaytan has no valid immigration status and would be placed in immigration detention and deported if released.

Second, Gaytan offers evidence that his children attended at least some elementary school in 2011 and 2013. Doc. 237 at 3-4. While commendable, these certificates are now more than eleven years old, and it is unclear whether either is still attending school or lives with Gaytan.

Third, Gaytan offers a single insurance card, for a different address (Apartment A), that expired almost ten years ago. Doc. 237 at 5.

Fourth, Gaytan submits a utility bill, for yet another address (Apartment C), that was apparently shared (or split) with "Jose Villanueva Castro."[2] Doc. 237 at 6-7.

Fifth, Gaytan submits two copies of the same set of three receipts for payments. The first receipt is a mortgage payment for "Yermon Gaytan," which does not appear to match Gaytan's name. The address (Apartment A) does not match the one on Gaytan's utility bill. The second two receipts are made out to Gaytan from Mida's Auto Sales Inc. Unfortunately for Gaytan, that business was a target in the DEA investigation that led to his indictment. The United States cannot go into detail in a public filing, but the owner of the business was the subject of a Title III wiretap and intercepted using what agents suspect to be code words directly with Mexican drug traffickers. It seems unlikely that Gaytan coincidentally purchased a vehicle from a complicit car dealership.

Sixth, Gaytan submits another insurance card, this time for the 2007 Avalanche purchased from Mida's Auto Sales. This card expired over six years ago.

---

[2] No Google results exist for a "Jose Villanueva Castro" in Albuquerque.

Seventh, Gaytan submits a series of brief letters from various individuals. The first one explains that Gaytan worked at his restaurant starting in 2004—two years before he supposedly entered the United States with a B-1 visa. Doc. 237 at 11. The remaining letters do not make exactly clear who is writing (by including an address, phone number, or other identifying details). Doc. 237 at 12-14. The final letter claims that Gaytan "has served time for his crimes which are more than sufficient," and appears to be a request for leniency in sentencing. *Id.* These letters are short, borderline anonymous, and do not provide much evidence on Gaytan's risk of flight or danger.

Finally, Gaytan submits an evaluation report related to his relative's medical condition. Doc. 238 at 2-8 (sealed).[3] The United States sympathizes with the difficulty of finding adequate social support for those with that medical condition. The report makes clear, however, that the relative is an adult with a record of excellent grades and numerous other relatives in the United States who can provide support in Gaytan's absence.

### III.    EVEN IF GAYTAN COULD OVERCOME THE PRESUMPTION, DETENTION WOULD BE REQUIRED.

#### A. The Nature and Circumstances of the Offense Charged

The charged offense is extremely serious. Gaytan was a dealer and runner for a large-scale local distribution ring that imported huge amounts of methamphetamine, cocaine, heroin, and fentanyl across the border from Mexico to the United States. The search warrants executed on November 29, 2023, uncovered 100 pounds of methamphetamine, 21 kilograms of cocaine, three kilograms of heroin, roughly 10,000 fentanyl pills, and 33 firearms.

Prior to these search warrants, agents believed that Gaytan primarily served as a runner for his co-defendant and longtime employer Juan Trejo-Mora. Between June 21, 2023, and June 30,

---

[3] This Response does not discuss the details of that report, although the Motion does. *See* Doc. 236 at 4.

2023, Gaytan and Trejo-Mora took delivery of approximately 100,000 fentanyl pills from Jordan Andrade-Valdez.

The November 29 search warrants did not improve Gaytan's position. It was quickly obvious that Gaytan was no stranger to drug trafficking. Miscellaneous rounds of ammunition were both scattered throughout the house and placed on a makeshift altar. Agents searching the small trailer's bathroom discovered a hidden compartment in a cabinet, where a false bottom concealed shrink-wrapped heroin and a loaded .45-caliber Hi-Point pistol. In the master bedroom, agents found additional heroin inside of a black backpack, as well as a 9mm Springfield XD pistol in the nightstand.[4]



*Figure 1: Santa Muerte Altar*

---

[4] Gaytan claimed that he possessed the Springfield pistol for his protection but did not address the pistol found in the hidden compartment in his bathroom.



*Figure 2: Kilogram in Hidden Compartment*



*Figure 3: Pistol in Same Hidden Compartment*



*Figure 4: Santa Muerte Necklace*



*Figure 5: Pistol in Nightstand*


*Figure 6: Safe with Bullets and Cracked Mobile Phone*


*Figure 7: Heroin in Backpack Next to Sandwich Bags*

Gaytan's Motion refers to his post-Miranda custodial interview, in which he admitted that he knew that he possessed the heroin and claimed he was holding it in exchange for cocaine.  He admitted, however, that he sold enough drugs each week to make his personal consumption habits free.

B. **The Weight of the Evidence Against Gaytan**

The weight of the evidence against Gaytan is overwhelming for three primary reasons.

First, Gaytan's voice appears on a series of wiretap calls:

June 26, 2023

- On June 26, 2023, agents intercepted a call between Jordan Andrade-Valdez and Juan Trejo-Mora.  During the call, Trejo-Mora asked for "twenty" of the "waitresses of the four fifty an hour plus tip."  Trejo-Mora explains that he will "tell my cousin" so that the cousin can "go over there to, around Blake, to a trailers over there."

- Trejo-Mora then called Gaytan, who lived at 4000 Blake Road SW—the same address where agents executed the search warrant.

- Trejo-Mora then again called Andrade.  Trejo-Mora explained that Andrade should call "him" to arrange "to delivery the, the, the material to, to have, to start the job."  Trejo-Mora followed up by texting Andrade with Gaytan's phone number.

- Later that day, Andrade placed a call directly to Gaytan.  Andrade asked, "where do you want to, want to meet to deliver the material?"  Gaytan suggested that they meet at "4000 Blake."  Gaytan explained that he was driving a black Mercedes.[5]  Andrade later sent his brother, Carlos Andrade-Valdez, to make the delivery.

- After an unsuccessful attempt to meet, Gaytan called Andrade again.  Gaytan again clarified that he was by the mailboxes at 4000 Blake.

- After the successful deal, Andrade called Trejo-Mora to report that "it's done with the guy there.  He gave it to him[.]"

June 30, 2023

- In a series of calls on June 30, 2023, Trejo-Mora and Andrade arranged for the delivery of 100,000 fentanyl pills[6]: 76,000 in one delivery, and another 24,000 in a second delivery.  Trejo-Mora suggested that Andrade "tell your brother to go over to the same place…to the trailers," explaining that "my cousin is there. He's ready too."  Trejo-Mora had called Gaytan immediately before he mentioned his cousin.

- As on June 26, Andrade then called Gaytan directly and arranged to meet him "at the offices" near "the trailers."

---

[5] It is unclear how Gaytan afforded a Mercedes while still making payments on a 2007 Chevrolet.

[6] Trejo-Mora and Andrade had an extended discussion about whether the number of pills would be correct.  Fentanyl pills are typically sold in large-scale transactions in 1,000-pill increments, and Andrade explained that he could count them by weight, noting that "[i]t always comes out to the thousand, or a thousand and two, like that."

- Agents were present on surveillance and watched Gaytan call Andrade in real time. This time, Andrade himself (rather than Carlos) met with Gaytan to hand over a cardboard box.

- As on June 26, Andrade called Trejo-Mora to confirm that the deal went as planned. He offered to "call you tomorrow and take you the other ones," i.e. the remaining 24,000 pills.

Second, the search warrant on Gaytan's residence confirmed much of what agents learned from the wiretap calls and provided independent charges for the heroin and firearms found on site. The photos above leave little doubt that Gaytan will have an uphill battle at trial.

Finally, the United States is continuing its investigation into Gaytan using mobile phone evidence. Although a DEA laboratory has thus far been unable to unlock his devices, despite diligent efforts, his co-conspirators' devices were not as secure. The United States has already noticed a suspicious series of $9,900 checks made out to Gaytan, which may have been intended to avoid scrutiny from legitimate banks' money laundering compliance departments.

### C. Gaytan's History and Characteristics

Gaytan's history and characteristics do not support release. Although he has no criminal history, his legitimate employment history is suspicious. He reported to Pretrial Services that he had no employment for two months before the execution of the search warrants. Doc. 69 at 1. He reported that he had been present in Albuquerque since 2005, despite his current claim that he entered legally in 2006. His prior employment, at "Big Tires," is also related to co-defendant Trejo-Mora. And his admission to agents that he sold drugs to fund his cocaine use suggests that he may have serious substance abuse issues. *See*, e.g., *United States v. Lee*, No. CR-03-1890 JB, 2004 WL 7338315, at *3 (D.N.M. Jan. 30, 2004) (noting defendant's "history of unresolved substance abuse issues"). Addiction can be a very expensive habit, which only increases the risk that Gaytan will return to trafficking.

10

### D. The Danger to the Community

Gaytan would pose a danger to the community if released. Congress's concern "about safety of the community is to be given a broader construction than the mere danger of physical violence. Safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Voog*, 702 F. App'x 692, 694 (10th Cir. 2017) (quoting *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989)). This criminal activity includes continued drug trafficking. *See* S. Rep. No. 98-225, reprinted in 1984 U.S.C.C.A.N. 3182, 3196) ("[T]he risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.'"). A defendant is more likely to continue trafficking where, as here, the offense involved a large quantity of drugs. *See United States v. Bolivar*, 455 F. Supp. 3d 1165, 1171 (D.N.M. 2020).

Gaytan also poses a threat of physical danger. As an alien (or the holder of a B-1 visa, for that matter) Gaytan was prohibited from possessing any firearms. *See* 18 U.S.C. §§ 922(g)(5)(B) and 922(y)(2); 27 CFR 478.11 and 478.32. Should the Court choose to release Gaytan, the Government will have to take immediate measures to protect confidential sources. Gaytan may use any newfound liberty to acquire firearms and retaliate against persons he believes to be among them.

## IV.    GAYTAN IS A FLIGHT RISK.

ICE will detain Gaytan immediately upon a grant of pretrial release.[7] Assuming that were not the case, however, Gaytan would present a significant flight risk. He has every incentive to

---

[7] While a pretrial detention decision should not be based solely on immigration concerns, "[a] defendant's immigration status and the existence of an ICE detainer are relevant to the detention decision as part of the history and characteristics of the defendant." *United States v. Salas-Urenas*, 430 F. App'x 721, 723 (10th Cir. 2011) (unpublished).

self-deport to Mexico to avoid prosecution.   The evidence against him is strong, including numerous recordings of his voice, the results of a search warrant on his residence, and a partial confession.  His Guideline range is high: the United States calculates it as 210 to 262 months.  His possession of a firearm disqualifies him for safety-valve relief and subjects him to a fifteen-year mandatory minimum.

Gaytan also has extensive ties to his home country.  His father, brother, and sister all reside there.  Doc. 69 at 1-2.  Given that the sources of supply in his case are affiliated with Mexican drug cartels, he also has the connections required to cross.  *See United States v. Varela*, No. CR 12-0128 JB, 2012 WL 13081272, at *7 (D.N.M. Feb. 21, 2012) (finding that defendant was a flight risk in part because "[t]he allegations in the case involve conduct that is tied to Mexico, including connections to the Sinaloa Cartel.").

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court deny the Motion.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/ Electronically filed October 25, 2024*
DAVID B. HIRSCH
Assistant United States Attorney
201 3rd Street SW
Albuquerque, NM  87103
(505) 224-1473

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

***Electronically Filed 10/25/24***
DAVID B. HIRSCH
Assistant U.S. Attorney