IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JORDAN ANDRADE-VALDEZ, a.k.a. "Jonathon,"<br>CARLOS ANDRADE-VALDEZ,<br>RICARDO TORRES-AYALA,<br>ADIR ALEJANDRO HERRERA POSADA,<br>EDGAR GAYTAN-CARRILLO,<br>DAVID SAENZ-PALACIOS,<br><br>Defendants. | ) | CRIMINAL NO. 23-1623-MLG |

**UNITED STATES' FIRST NOTICE OF INTENT TO INTRODUCE EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b) AND *RES GESTAE***

The United States hereby delivers notice that it intends, as part of its case in chief, to introduce evidence of other crimes, wrongs, and acts by Defendants Edgar Gaytan-Carrillo ("Gaytan") and Adir Alejandro Herrera Posada ("Posada"),[1] in making its case to the jury at trial. Although not all of the evidence described below falls within the parameters of Rule 404(b), the United States provides this notice in an abundance of caution in case the Court determines otherwise.

**RELEVANT FACTS**

## I. Background

The Defendants, including Gaytan and Posada, operated a traditional DTO that imported

[1] Counsel for the remaining Defendants have indicated that their clients will likely accept a plea agreement in short order. The United States reserves the right to supplement this Notice if any of them reverse course and proceed to trial.

large amounts of methamphetamine, cocaine, heroin, and fentanyl across the international border from Mexico to the United States. The organization's leaders—first David Mendoza-Enriquez, then Jordan Andrade-Valdez—used their connections to Mexican cartels to purchase controlled substances in bulk. The Mexican sources of supply sent couriers to deliver the shipments to Albuquerque. Distributors helped to store and redistribute the drugs supplied by Mendoza and Andrade. Over the course of two years, the DTO sold hundreds of thousands of fentanyl pills and hundreds of pounds of methamphetamine in the Albuquerque area.

## II. Gaytan

Gaytan faces charges in this case for two primary reasons. First, Gaytan participated in a series of wiretap calls that arranged the distribution of over 100,000 fentanyl pills. These calls were clustered around two dates:

<u>June 26, 2023</u>

- On June 26, 2023, agents intercepted a call between Jordan Andrade-Valdez and Juan Trejo-Mora. During the call, Trejo-Mora asked for "twenty" of the "waitresses of the four fifty an hour plus tip." Trejo-Mora explains that he will "tell my cousin" so that the cousin can "go over there to, around Blake, to a trailers over there."

- Trejo-Mora then called Gaytan, who lived at 4000 Blake Road SW—the same address where agents executed the search warrant.

- Trejo-Mora then again called Andrade. Trejo-Mora explained that Andrade should call "him" to arrange "to delivery the, the, the material to, to have, to start the job." Trejo-Mora followed up by texting Andrade with Gaytan's phone number.

- Later that day, Andrade placed a call directly to Gaytan. Andrade asked, "where do you want to, want to meet to deliver the material?" Gaytan suggested that they meet at "4000 Blake." Gaytan explained that he was driving a black Mercedes.[2] Andrade later sent his brother, Carlos Andrade-Valdez, to make the delivery.

---

[2] It is unclear how Gaytan afforded a Mercedes while still making payments on a 2007 Chevrolet.

- After an unsuccessful attempt to meet, Gaytan called Andrade again. Gaytan again clarified that he was by the mailboxes at 4000 Blake.

- After the successful deal, Andrade called Trejo-Mora to report that "it's done with the guy there. He gave it to him[.]"

June 30, 2023

- In a series of calls on June 30, 2023, Trejo-Mora and Andrade arranged for the delivery of 100,000 fentanyl pills[3]: 76,000 in one delivery, and another 24,000 in a second delivery. Trejo-Mora suggested that Andrade "tell your brother to go over to the same place…to the trailers," explaining that "my cousin is there. He's ready too." Trejo-Mora had called Gaytan immediately before he mentioned his cousin.

- As on June 26, Andrade then called Gaytan directly and arranged to meet him "at the offices" near "the trailers."

- Agents were present on surveillance and watched Gaytan call Andrade in real time. This time, Andrade himself (rather than Carlos) met with Gaytan to hand over a cardboard box.

- As on June 26, Andrade called Trejo-Mora to confirm that the deal went as planned. He offered to "call you tomorrow and take you the other ones," i.e. the remaining 24,000 pills.

Second, agents executed a search warrant at Gaytan's residence on November 29, 2023. Agents searching the small trailer's bathroom discovered a hidden compartment in a cabinet, where a false bottom concealed shrink-wrapped heroin and a loaded .45-caliber Hi-Point pistol. In the master bedroom, agents found additional heroin inside of a black backpack, as well as a 9mm Springfield XD pistol in the nightstand.[4]

## III. Posada

Posada was one of the most active members of Jordan Andrade's drug trafficking

[3] Trejo-Mora and Andrade had an extended discussion about whether the number of pills would be correct. Fentanyl pills are typically sold in large-scale transactions in 1,000-pill increments, and Andrade explained that he could count them by weight, noting that "[i]t always comes out to the thousand, or a thousand and two, like that."

[4] Gaytan claimed that he possessed the Springfield pistol for his protection but did not address the pistol found in the hidden compartment in his bathroom.

organization ("DTO"). He first served as Andrade's runner, making drug deliveries and picking up the resulting cash for return to the organization's stash houses. He participated in dozens of recorded calls regarding the distribution of narcotics. He was also directly involved in undercover purchases on September 21, 2022 and May 12, 2023. Finally, he counted out the pills for the large fentanyl deal involving Gaytan, as discussed above.

By the end of the conspiracy, Posada had apparently received a promotion. Agents executed a search warrant at his residence on November 29, 2023. Within his one-bedroom apartment, they located:

- Over 5.4 kilograms of methamphetamine (actual), from under his bed;[5]
- Approximately 18.9 gross kilograms of cocaine;[6]
- Almost 1 kilogram of heroin;[7] and
- Approximately 500 grams of fentanyl.[8]

Within a closet 8-10 feet from the drugs, agents located three firearms, as well as assorted ammunition.[9]

---

[5] 586.7 net grams of methamphetamine (Ex. 1009); 2,665 net grams of methamphetamine (Ex. 1002); 2,192 net grams of methamphetamine (Ex. 1010).

[6] 2.15 gross kilograms of cocaine (Ex. 1003); 9.8 gross kilograms of cocaine (Ex. 1008); 548 gross grams of cocaine (Ex. 1012); 6.1 gross kilograms of cocaine (Ex. 1013); 151.8 gross grams of cocaine (Ex. 1016); 315.9 gross grams of cocaine (Ex. 1017).

[7] 795.7 grams of heroin (Ex. 1001); 165.8 gross grams of heroin, not field-tested (Ex. 1004).

[8] 478.2 gross grams of fentanyl (Ex. 1011); 68.7 gross grams of fentanyl (Ex. 1000); and 214.4 gross grams of fentanyl (Ex. 1014).

[9] Including a Desert Eagle .50 caliber pistol, serial number DK0053881, loaded with six rounds but without a round in the chamber (N-1018); a black Del-Ton AR-style rifle, serial number DTI-S108367 (N-1020); a black Century Arms AK-style rifle, serial number M70AB27528 (N-1019); and various magazines and ammunition in 9mm, .45, and .50 calibers.

## RELEVANT LAW

### I. Rule 404(b)

Rule 404(b) permits the admission of evidence of other crimes, wrongs, or acts unless they are offered "solely to prove a defendant's criminal disposition." *United States v. Naranjo*, 710 F.2d 1465, 1467 (10th Cir. 1983). Rule 404(b) is an inclusive rule, and evidence of other crimes, wrongs or acts is to be admitted when it proves something other than criminal propensity and bad character, even if the evidence also demonstrates propensity. *See United States v. Moran*, 503 F.3d 1135, 1145 (10th Cir. 2007) (*citing United States v. Cherry*, 433 F.3d 698, 701 (10th Cir. 2005); *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001)). Generally, bad acts are offered to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed. R. Evid. 404(b).

The Tenth Circuit employs a four-part test to determine if evidence is admissible under 404(b): (1) the evidence must be offered for a proper purpose under Rule 404(b); (2) the evidence must be relevant under Rule 401; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the trial court shall, upon request, instruct the jury pursuant to Rule 105 to consider the evidence only for the proper purpose for which it was admitted. *United States v. Smalls*, 752 F.3d 1227, 1237 (10th Cir. 2014).

### II. Intrinsic Evidence

*Res gestae* or intrinsic evidence has been defined as evidence of other acts that are inextricably intertwined with the charged offense or are necessary to complete the story of the charged offense. *United States v. Sangiovanni*, No. CR 10-3239 JB, 2013 WL 1655918, at *10 (D.N.M. March 20, 2013) (Browning, J.) (citing *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)). The Tenth Circuit has held that other act evidence is intrinsic when the evidence of

the other act and the evidence of the charged crime are inextricably intertwined, both acts are part of a single criminal episode, or the other acts were necessary preliminaries to the crime charged. *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011).

As noted by the *Sangiovanni* Court, the Tenth Circuit in *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1999), described *res gestae* evidence as "inextricably intertwined with proper evidence." *See Sangiovanni*, 2013 WL 1655918, at *10. Such evidence "has a causal, temporal or spatial connection with the charged offense." *Id.* at 11. "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.*

"But even relevant intrinsic evidence must still satisfy the requirements of Federal Rule of Evidence 403: a district judge may exclude it 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice.'" *United States v. Hood*, 774 F.3d 638, 644 (10th Cir. 2014). Tenth Circuit law "*favors* admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule [403] is 'an extraordinary remedy [that] should be used sparingly.'" *Irving*, 665 F.3d at 1213 (emphasis original) (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)). Evidence is not unfairly prejudicial simply because it is damaging to the defendant's case. *United States v. Martinez*, 938 F. 2d 1078, 1082 (10th Cir. 1991). "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged." *Rodriguez*, 192 F.3d at 951 (emphasis added) (internal citations omitted). Furthermore, in conducting the Rule 403 balancing test, this Court must "give the evidence its maximum reasonable probative force and its

minimum reasonable prejudicial value." *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008) (internal quotation and citation omitted). Even if the evidence were to adversely affect the jury's attitude toward the defendant, such prejudice does not itself "substantially" outweigh its probative value. *See Irving*, 665 F.3d at 1213-14. Whatever prejudice stems from the relevant testimony can be moderated by cautionary instructions from the Court at the time of the admission of the evidence and, if requested, again in the final charge to the jury at the close of the case. *United States v. Record*, 873 F.2d 1363, 1376 (10th Cir. 1989).

## ARGUMENT

The United States hereby gives notice that it intends to introduce the following categories of evidence in its case-in-chief.[10] If the Court admits any of this evidence under Rule 404(b), the United States respectfully requests that the Court instruct the jury to only use the evidence for a proper purpose. *See* Tenth Circuit Pattern Instruction 1.30.

## I. Gaytan

### A. Firearms

Both pistols found in Gaytan's residence are admissible as intrinsic evidence on his 18 U.S.C. § 924(c) charge, and as evidence of his possession with intent to distribute the heroin found nearby. Firearms are "tools of the trade" for drug traffickers. *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991). And, as an alien, Gaytan was not permitted to possess any firearm. *See United States v. Lin*, No. CR-23-192-G, 2024 WL 5048785, at *2 (W.D. Okla. Dec. 8, 2024) (admitting evidence of legally owned firearms in drug trafficking case pursuant to Rule 404(b)).

[10] As noted above and discussed below, the United States believes some of this evidence constitutes direct evidence of the offenses charged in the indictment, not Rule 404(b) evidence. However, notice is being provided out of an abundance of caution.





**B. Safe Full of Bullets**

Gaytan's residence also contained a safe full of loose ammunition, and a broken mobile phone:



This evidence is admissible for the same reasons as the pistols found nearby. The photograph displays a plastic holder for ammunition with space for 50 rounds, many of which are either present on the alter (see below) or loaded into one of the pistols.

**C. Santa Muerte Altar**

During the search of Gaytan's trailer on November 29, 2023, agents located a shrine to Santa Muerte—the folk saint of drug traffickers—together with offerings of ammunition and apples.



Gaytan also possessed a "chain" featuring Santa Muerte:



This evidence is admissible under Rule 404(b) to show Gaytan's intent to distribute the drugs found in his apartment. The United States notes that one Tenth Circuit case disapproving this testimony did not prohibit all use of Santa Muerte iconography as 404(b) evidence. *United States v. Medina-Copete* "held that it was inappropriate to admit speculative, meandering testimony regarding whether veneration of certain 'narco' saints during a stop was evidence that the occupants of the vehicle knew that they were transporting drugs." *United States v. Vann*, 776 F.3d 746, 759 (10th Cir. 2015). The Tenth Circuit has since commented that "*Medina–Copete* is the exception not the rule[.]" *Id.* And the United States there argued that Santa Muerte was a "tool

of the trade," "used" to traffic drugs. *Medina-Copete*, 757 F.3d at 1102. In reality, the sort of icons Gaytan possessed do not actually provide protection from a narco-saint in the same way that plastic baggies allow for the easy sale of smaller amounts of drugs. Instead, they signal to other traffickers that the owner is involved in the trade, and serve as powerful evidence of their owners' state of mind. They are analogous to gang "colors" or other admissible indicators of membership in a criminal organization.

**D. Admissions**

After agents arrested Gaytan, he waived his *Miranda* rights and agreed to speak with them. He admitted that he knowingly possessed the heroin, but claimed that he did so in exchange for cocaine. He claimed that he sold enough drugs each week to pay for his personal cocaine habit.

Gaytan's admissions are of course intrinsic evidence of his knowing possession of the heroin, as well as his intent to distribute it. His discussion of his own cocaine use is also admissible under Rule 404(b) as evidence of motive. A man with an expensive habit, like cocaine use, would need a steady supply of cash to feed it.

**E. Mobile Phone Evidence**

The following evidence was obtained from N-1507, which carried the phone number 505-730-4226 and was intercepted during the wiretap. Gaytan's conversations regarding cocaine sales and photos of cocaine are relevant to show that he intended to distribute the drugs found in his residence on November 29, 2023. His conversations regarding firearms are relevant to show that he was actively involved in buying and selling firearms, and did not possess them only to protect himself and his family. *See, e.g.*, *United States v. Topete-Madrueno*, No. 18-CR-4172 JAP, 2019 WL 5087410, at *4 (D.N.M. Oct. 10, 2019) (admitting evidence from the cell phones seized from a defendant's residence under Rule 404(b)).

### 1. 6772 Number

On November 16, 2023, Gaytan exchanged messages with the user of 505-550-6772. *See* Exhibit 1. The user of 6772 complained: "Hello… oye la de anoche estaba mala me lastimo muchisimo mi nariz que onda," or "the stuff from last night was bad, my nose hurt a lot, what's up?" Gaytan responded: "Estaba mas limpia. . . Tenia menos corte," or "It was cleaner, with less cuts." Agents will testify that this conversation concerned a customer's complaint that cocaine had hurt his/her nose, and Gaytan's response that it was uncut, and thus more powerful. On November 18, the user of 6772 had the opposite complaint: "Esta tenia mucho corte ni me pego nada," or "this one had a lot of cut and didn't hit me at all." Gaytan responded that he would give the other person one next time. Agents will testify that dealers may give users/customers free amounts of cocaine to maintain the customer relationship if one purchase proves unsatisfactory.

### 2. 0958 Number

Between November 4 and 6, 2023, Gaytan exchanged messages with the user of 505-347-0958. *See* Exhibit 2. The user sent Gaytan a screenshot of a Snapchat message from "Alexx Ibarra," a known local drug trafficker. The message includes a photograph of two firearms, with text "Lmk" superimposed.




Agents will testify that, based on their training and experience, this photograph is consistent with a firearms seller attempting to advertise their goods for sale. When Gaytan responded, "No… Cómo en una hora los boy a ver," or "No…I'm going to see them in around an hour," the user of 0958 followed up with another photograph, and suggested that they were worth $700:



**3. 2749 Number**

Between July 7, 2023 and October 31, 2023, Gaytan exchanged numbers with the user of

760-575-2749. *See* Exhibit 3. The user asked Gaytan if he had a "connect" in Farmington and, later, Utah. Gaytan offered to sell a half ounce of an unknown substance for $500. Later, when the user asked Gaytan if he "still had the nine," Gaytan responded that he would find the user "another one." When the user said that he was visiting Albuquerque, Gaytan noted that he "agarre muchos juguetes, or "grabbed a lot of toys." Agents will testify that, based on their training and experience, Gaytan and the user were discussing the sale of cocaine and firearms.

**4. 8049 Number**

Between May 17, 2023 and July 13, 2023, Gaytan exchanged photographs of firearms via text message with the user of 720-681-8049. *See* Exhibit 4. These photographs include the following:

Gaytan:




8049:











**5. Cocaine Photos**

Gaytan's mobile phone also contained at least one image of a large amount of cocaine, which had metadata suggesting a capture time of September 17, 2023:



### F. Immigration Status

During his detention appeal, Gaytan claimed to be "a Mexican national who has been residing in Albuquerque since approximately 2006 when he legally entered on a B1 visa." Doc. 236 at 1. A B-1 visa, per the U.S. Citizenship and Immigration Services, allows applicants to stay for up to one year.[11] It requires that applicants: "plan to remain for a specific amount of time" and "have a residence outside the United States that you have no intention of abandoning." *Id.*

In reality, Gaytan either overstayed his visa or re-entered the country illegally after returning to Mexico. The United States does not seek to argue that he is a bad person because he was unlawfully present, but rather than he had no right to possess a firearm. The Tenth Circuit has provided factors that jurors can use to determine whether a firearm was possessed in furtherance of a drug trafficking crime. They include "the status of the possession (legitimate or illegal)." Tenth Circuit Criminal Pattern Jury Instruction 2.45.1. The United States is willing to reach a stipulation with Gaytan to avoid even the risk of unfair prejudice on this issue.

## II. Posada

---

[11] *See* https://www.uscis.gov/working-in-the-united-states/temporary-visitors-for-business/b-1-temporary-business-visitor.

### A. Firearms and Ammunition

Posada's small arsenal is admissible for the same reasons as Gaytan's pistols—both as substantive evidence on the 924(c) charge and as "tools of the trade" for drug trafficking. *Martinez*, 938 F.2d at 1083.







### B. Flight to Mexico

In July 2023, a DEA analyst inadvertently identified herself as a DEA employee during a call with a complicit car dealership. Toll records confirmed that the man who answered the phone at the dealership immediately called DTO head Jordan Andrade-Valdez. Andrade stopped using his mobile phones, dropped his considerable stash of narcotics with Ricardo Torres, and fled for

Mexico.[12] Posada went with him. Although the men later returned to Albuquerque, the United States will present evidence of Posada's flight at trial. "[F]light evidence carries with it a strong presumption of admissibility." *United States v. Martinez*, 681 F.2d 1248, 1256 (10th Cir. 1982). And "most courts have held that evidence of flight is admissible under Rule 404(b)." *United States v. Swinton*, No. 2:22-CR-121 TS, 2022 WL 16797631, at *1 (D. Utah Nov. 8, 2022) (collecting cases).

### C. Admissions

After the November 29, 2023 search warrant, Posada waived his Miranda rights and spoke with DEA agents. He admitted that he delivered packages for Jordan Andrade but denied any knowledge of their contents.

Posada's post-arrest statements are admissible as evidence of his agreement with Andrade and others to distribute drugs. They also tend to show that he intended to distribute the large cache of drugs found in his apartment.

### D. Immigration Status

Like Gaytan, Posada had no legal immigration status and was not permitted to possess firearms. This fact will be intrinsic evidence on his charge under 18 U.S.C. § 924(c).

## III. Rule 403

None of this evidence is unfairly prejudicial. It does not "provoke[] an emotional response from the jury" or affect the jury's attitude towards Defendant "wholly apart" from its judgment as to his guilt or innocence. *Rodriguez*, 192 F.3d at 951 (internal citations omitted). Like the rest of

[12] Agents are aware of these facts due to electronic surveillance and a July 10, 2023 call between Torres and an undercover DEA agent. During the call, Torres reported that his supplier (in reality, Andrade) had left for Mexico out of fear that unspecified people were trying to "take him down." Torres added that his supplier left the entire cache of drugs at his residence and offered to sell UC-1 15,000 fentanyl pills for 80 cents per pill.

the United States' evidence, these facts will adversely affect the jury's attitude towards Defendants in a way that is entirely legitimate and inextricably intertwined with their guilt.

## CONCLUSION

The United States hereby notifies the Court and the Defendants of its intent to offer the above-described evidence in the prosecution's case-in-chief, and respectfully requests that the Court issue a pretrial ruling allowing the admission of this evidence at trial.

Respectfully submitted,

RYAN ELLISON
United States Attorney

***Electronically filed June 19, 2025***
DAVID B. HIRSCH
Assistant United States Attorney
Albuquerque, New Mexico 87103

I CERTIFY that a true copy of the foregoing pleading was provided to opposing counsel of record, via CM/ECF, on this date.

***Electronically filed June 19, 2025***
DAVID B. HIRSCH
Assistant United States Attorney