**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.** **Case No. 23-CR-1623 MLG**

**DAVID MENDOZA ENRIQUEZ,**

**Defendant.**

**SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**

David Mendoza Enriquez (Mr. Mendoza), by and through his attorney, Dennis J. Candelaria, respectfully submits this sentencing memorandum. Mr. Mendoza requests that this Court find that a variance outside the sentencing guideline range is appropriate and to impose a sentence of 180 months.

Mr. Mendoza is before the court because he made multiple decisions that were selfish. He recognizes that the crimes he committed were harmful to his community. He regrets his mistakes and apologizes to everyone he knows and all who were affected by the drugs that reached the neighborhoods in Albuquerque and beyond. He now accepts responsibility.

Mr. Mendoza's life is not defined by this crime. To understand why he committed this crime and why he is before this Court, it is important that this Court be introduced to this young man. Mr. Mendoza was born on January 6, 1983, in Ciudad Juarez, Mexico.

He was the first child and only son. He has two younger sisters.

Mr. Mendoza grew up on the dirt roads of Ciudad Juarez (Juarez). Mr. Mendoza was born in 1983. At the same time Juarez was experiencing a population growth, the city was experiencing a growth of migrants from Mexico's interior. These migrants were moving to the city to find work in the maquiladoras (factories) or cross into the United States in search for better wages. With this influx of migrants, there was a spike in violent crime. Ciudad Juarez was recognized as one of the most violent cities in the world.[1] Mr. Mendoza's adolescence was rife with daily news of the extreme violence that was an everyday occurrence in his neighborhoods. Mr. Mendoza recalls the experience watching two guys running through the streets. One chasing the other with a machete. "The guy with the machete catches up with and stabs the guy he was chasing. He stops turns around and leaves." Mr. Mendoza was left to witness the ambulance and police arrive, place the body on the gurney, push the person into the ambulance and drive away. A memory that he cannot escape. Despite the crime in the city, Mr. Mendoza's parents were committed to making sure that their children were safe.

Mr. Mendoza's parents worked long hours and shared the same work schedule. They would wake up in "la madrugada". The household started at 4:00 a.m. and his parents were out the door by 4:30. His dad was a short-order cook. His mom worked in the infamous Bordertown maquiladoras. They worked until 6:00 p.m. Thirteen-hour days were routine. Mr. Mendoza admired how hard his parents worked. Even if it meant that

[1] In 2010, there were 3,111 murders in the city of Juarez, Mexico. Filmmaker Charlie Minn documented the tragic violence in Ciudad Juarez in his film "8 Murders a Day".

they were not home, he knew that they were working to make a better life for the family. While his parents were working, his grandparents tried their best to raise the children.

Mr. Mendoza's family lived in a one-room house. The only room in the house that had privacy was the bathroom. Otherwise, the room was divided into three parts. His parents' bed in one corner, his sisters' bed in the second corner, and his bed in the third corner. The house was so small that every morning you can smell body odor or "fuchi patas." His family farted or snored all night. Despite the tiny living quarters, Mr. Mendoza lived a decent life.

His needs were met. His clothes may have been ill-fitting, he may have worn them several times per week, and they may have been hand-washed, but he had clothes, and for that, he was grateful. The pantry was limited to beans, rice, papas, chile and tortillas. He had food and for that, he was grateful. He remembers his "abuelo" making picadillo (a Mexican dish made with ground beef, potatoes, and jalapenos). "Abuelo would put cooking oil in the pan, then the ground beef, then the potatoes and finally add the jalapenos." He laughs as he recalls his abuelo putting too much oil in the pan. The oil would collect at the bottom of the plate or ooze out of the tortillas as he bit into his burrito. To this day, he still doesn't know why his grandpa added so much oil. The irony was that his dad was a cook and Mr. Mendoza also became a cook and owned a couple of Mexican restaurants. His sisters now own his restaurant. He wants this Court to know that he doesn't cook with so much oil.

In hindsight, Mr. Mendoza is apologetic about the manner in which his grandpa cooked over the stove top. His grandpa was confined to a wheelchair. He could not see

high enough. He did not clean the surface and did not see that the stove top had dead "cucarachas." Mr. Mendoza bit into a burrito and found his burrito had cockroach parts. He was "grossed out" and told his grandpa that he would help with cooking and cleaning the kitchen area. He credits this experience as the catalyst that moved him forward to being a restaurateur.

Because his parents worked long hours, his grandparents oversaw the grandkids. "They made the best couple." His grandpa didn't have a leg. He was physically disabled and bound to his wheelchair. His grandma had Alzheimer's. She was mentally disabled. However, the two worked together to take care of themselves and their grandkids. He describes his abuelos as old and frail but kind and considerate. "Giving to everyone who entered their home."

Mr. Mendoza grew up with his two younger sisters. The family grew up with their cousins. It was a big extended family. They were normal kids who played a lot in the empty lots. They played hide-and-seek, tag, or soccer. They gathered near the one television to watch the Mexican Soccer League where they cheered for their favorite teams. The neighborhood was a cacophony of children's laughter. It was a small tight community. If he were not playing with the neighborhood kids, he would collect cans, copper or any kind of metal that he could recycle. He would cash in his collection and with the money he would buy a loaf of bread, a package of bologna and cheese, and a "Mexican" coke to wash it down.

Mr. Mendoza parents were as strict. When they were home, they made sure that Mr. Mendoza was doing his part in taking care of his sisters and helping his grandparents

with chores. He was required to clean the house, take out the garbage, or run errands. The family grew up in a Christian household. They were Baptist and attended Sunday services. Mr. Mendoza is still actively attending Bible study at Torrance County Detention Center.

The family did not grow up in a neighborhood with white picket fences and manicured lawns. It was the “centro” of Juarez. The summers were long, hot and sticky. No air conditioning. Mr. Mendoza’s dad would come home and cool down with ice cold cervezas with a twist of lime and a shake of salt. Most of the time there were too many cervezas. His mom would kick him out of the house and a few days later his dad would return with promises that he would stop. This was a reoccurring cycle until one day, Mr. Mendoza’s dad finally stopped. He changed. To this day he is sober.

Soon after his dad changed his life, he decided to change Mr. Mendoza’s life. Mr. Mendoza loved school. He navigated the hallways, he made friends easily and liked his teachers. Unfortunately, Mr. Medoza’s family could not pay for his education past sixth grade. Even though Mr. Mendoza stayed after school cleaning the blackboards, the classrooms, and the school, it wasn’t enough. The family couldn’t afford it. He dropped out and started working at 13 years old. He worked at the local grocery store. He earned tips and used the extra money to help his mom and dad pay bills. This money was used to pay for a tourist visa to the United States. At 14 years old, his dad lawfully sent him with his uncle to the United States.

Mr. Mendoza was initially taken aback by his living conditions and his new responsibilities. He was living with 10 men in a three bedroom and one bathroom

apartment. They lived together to split the costs. He was fortunate enough to sleep in a bedroom with his uncle and grandpa. “There were two guys sleeping in the kitchen and four guys in the living room. I felt sorry for them because they never had privacy.”

He was 14 years old when he started working in Cuco’s Kitchen in Albuquerque. He started as a dishwasher, then busboy, and eventually landed as a cook. For the next few years, he hustled in the kitchen learning about the business of running a Mexican restaurant. At 17, he returned home. It was difficult finding a job in Ciudad Juarez. After trying to find a good paying job in Ciudad Juarez, he returned to the United States at 20 years old. He has been continuously in the United States for the past 22 years. Since his arrest, Mr. Mendoza’s uncle has passed. He was a second father. Mr. Mendoza now reflects that life is too short and that being in custody he will miss the most important things in life.

Mr. Mendoza settled into a wonderful life in the United States. He worked hard in the restaurant business. On weekends to help ends meet, he would go to the “pulga.” The “pulga” is better known as the flea market on the State Fair Grounds on the corner of Central and Louisiana. Initially, this was a blessing. He rented two spaces. From those spaces, he sold NFL, NBA, and MLB merchandise…caps, jerseys, and socks. His favorite team is the New England Patriots. He worked 7 days a week. He worked 5 days at the restaurant and his weekends were spent selling merchandise at the flea market. He believed it was worth it. “Whatever was required to make sure that his wife and children had a roof to live under, food in the cupboards, and clothes on their backs.” He married Mireyda Duron. Together they have 4 children. His children are all U.S. citizens. All he

wanted to do was be a good husband and father. His wife describes him as a good man and a great father. Mr. Mendoza's youngest son is seeing a therapist because his son blames himself for his father's situation. His son was always asking for money. His son confided in his therapist that his dad would "was only selling drugs because of me." His son blames himself for Mr. Mendoza's current situation.

This begs the question as to how this once legitimate, good, hardworking father could be before this Court facing a lengthy sentence. Mr. Mendoza was good friends with the other stall owners at the flea market. During the long hours he had plenty of time to "chew the fat" with the other vendors. His neighbor was also from Mexico and unbeknownst to Mr. Mendoza, he was a small-time cocaine dealer. He dealt in small quantities, he had a list of customers, but it came with a dozen problems. One day his friend told him… "no vale la pena" and asked him if he wanted the business. It came with zero ties. His friend simply wanted out and wanted to return to Mexico. Mr. Mendoza accepted the offer. He worked hard, he had Mexican connections, and he spoke the language. He took over this small cocaine business.

Today, Mr. Mendoza is before this court because he accepted an "offer that was too good to be true." He started selling drugs. Life was fast and the money was easy when compared to the long hours he was used to working. He no longer had to work 24/7. He was trafficking drugs because he knew what it meant to be truly poor. He understood how embarrassing it was to only own two shirts or shave your own head bald because you can't afford a barber. It was humbling to apply for food stamps only to be rejected. "Easy money" now comes with hard time and he knows that there is no one to

blame for the decisions that he made.

A sentence of 180 months plus 5 years of supervised release is a sentence that is sufficient and not greater than necessary. Mr. Mendoza's has a history of overcoming obstacles. His life pattern provides the most hope for his future, and in no small way, most strongly indicates the appropriateness of a sentence of no more than 15 years.

There are factors that justify a variance in this case and compel the finding that a sentence of fifteen years is an appropriate and reasonable sentence. Mr. Mendoza's post-offense conduct has been exemplary even while he has been in custody pending his sentence. Mr. Mendoza has been in custody since his arrest on January 19, 2023. While in custody he had two options: sit back and do nothing or try to make lemonade out of lemons. For the past 18 months, Mr. Mendoza has taken advantage of every opportunity that the Torrance County Detention Center has provided in self-help and self-awareness classes. We now see his road to lawful reintegration is possible and a lengthy incarceration could work against his progress.

Mr. Mendoza requests that the court find that a sentence of fifteen years of incarceration is appropriate in this case given his personal history and characteristics, the nature of the charges, and the types of sentences available. Mr. Mendoza's history and characteristics, militates in favor of a variance to a sentence of fifteen years. Primarily, it is worth pointing out that Mr. Mendoza, a 42-year-old man, has no criminal history.

The absence of any prior custodial sentence is a significant factor in Mr. Mendoza's background. The absence of a prior custodial sentence increases substantially the deterrent effect of this sentence. As one court has stated, "a lesser period of

imprisonment is required to deter a defendant not previously subject to lengthy incarceration." *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wisc. 2005). Having never spent time in custody prior to this case, less time is necessary to accomplish the purposes of sentencing. *See United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (finding a variance appropriate where a defendant "had never been confined before, so this period was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances"). Given the absence of any prior custodial sentence, a fifteen-year term of incarceration will satisfy the purposes and accomplish the statutory goals of sentencing.

A sentence is sufficient, but not greater than necessary, if it a) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; b) affords adequate deterrence to criminal conduct; c) protects the public from further crimes of the defendant, and d) effectively provides the defendant with needed education or vocational training and medical care. Fifteen years incarceration satisfies all the statutory requirement under 3553 factors. As discussed, Mr. Mendoca 15 years is a just sentence under these circumstances, it will also provide the most promise of deterrence.

A review of the applicable sentencing guidelines, the sentencing range established by those guidelines, the basis for a variance, and the relevant policy statements, indicates that a sentence of 15 years is sufficient. Given this offense, Mr. Mendoza may participate in the Bureau of Prisons 500 hour prison recovery program but will not be able to receive a reduction of his sentence upon successful completion. Despite this lack of reward, Mr.

Mendoza wants to be given a recommendation by this Court to participate in the program to continue his recovery, rehabilitation and reunion with this family as soon as possible.

***Wherefore***, Mr. Mendoza respectfully requests that the Court find that a variance is justified in this case for a final sentence of no more than 180 months.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

***Electronically filed July 22, 2025***
/s/ Dennis J. Candelaria
Assistant Federal Public Defender